Docket No. 99457.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

RYAN MURRAY *et al.*, Appellants, v. CHICAGO YOUTH
CENTER *et al*., Appellees.

*Opinion filed February 16, 2007.*

JUSTICE KILBRIDE delivered the judgment of the court, with
opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Garman,
Karmeier, and Burke concurred in the judgment and opinion.

**OPINION**

Plaintiffs, Ryan Murray and his mother, Joyce Mayers, brought an
action against defendants, the Chicago Board of Education (the
Board), Chicago Youth Centers (CYC), and CYC employee James
Collins (Collins) to recover for serious injuries suffered by Ryan and
for medical expenses incurred as a result of a mini-trampoline
accident. The circuit court of Cook County first denied, but ultimately
granted defendants' motions for summary judgment, holding
defendants immune from liability pursuant to sections 2–201 and
3–108(a) of the Local Governmental and Governmental Employees
Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2–201,
3–108(a) (West 1992)).

The appellate court affirmed the circuit court's grant of summary judgment, on the separate grounds alleged in CYC and Collins's motion for summary judgment. 352 Ill. App. 3d 95. The appellate court held section 3–109(c)(2) of the Tort Immunity Act (745 ILCS 10/3–109(c)(2) (West 1992)) was applicable and, accordingly, the immunity afforded defendants by the Tort Immunity Act did not extend to willful and wanton acts. 352 Ill. App. 3d at 105. However, the appellate court also held, as a matter of law, the facts as set forth in plaintiffs' second amended complaint, along with the depositions, affidavits and other documents on file, would not support a finding that defendants acted willfully and wantonly. 352 Ill. App. 3d at 106.

We allowed plaintiffs' petition for leave to appeal. 177 Ill. 2d R. 315. On July 5, 2006, we issued an opinion affirming the judgment of the appellate court, but subsequently allowed plaintiff's petition for rehearing. 210 Ill. 2d R. 367. We now reverse the judgments of the appellate and circuit courts, and remand for further proceedings.


BACKGROUND

On December 14, 1992, Ryan Murray was a 13-year-old student at Byrn Mawr School, operated by defendant, the Chicago Board of Education (Board). On that day, Ryan was participating in an extracurricular lunch period tumbling class sponsored by the Board and conducted by defendants, Chicago Youth Center (CYC) and its employee, James Collins. Ryan apparently attempted to perform a forward flip off a mini-trampoline and landed on his neck or shoulders. As a result of the accident, Ryan is now a quadriplegic.

Ryan and his mother, Joyce Mayer, brought suit against defendants. Plaintiffs' second amended complaint alleged that defendants, "with an utter indifference and conscious disregard for the safety of Ryan Murray, were willful and wanton." Plaintiffs further alleged, *inter alia*, that defendants knowingly and intentionally or with reckless disregard, failed to supply appropriate safety and protective equipment, failed to supply a spotter, failed to warn Ryan of the risk of spinal cord injury, and failed to stop the class from using the trampoline unsafely. Plaintiffs further alleged the Board was willful and wanton in failing to supply a harness and safety belt, and supplying inadequate gymnastic floor mats rather than proper trampolining "landing mats." Plaintiffs' complaint also included claims

-2-

of negligence against defendants, and product liability claims against Sports Supply Group, identified in earlier pleadings as BSN Sports, Inc., and GSC Sports. Those claims are not subjects of this appeal.

In his discovery deposition, James Collins testified that CYC offered the tumbling class at Bryn Mawr with the permission of the Board. Beginning in the spring 1992 semester, Collins, a CYC employee, began instructing the tumbling class. Collins had a degree in physical education and limited experience with tumbling, gymnastics, and the mini-trampoline. Collins had no license or certificate qualifying him as a trampoline instructor or teacher. Collins had never taught the mini-trampoline to anyone prior to instructing the tumbling class at Bryn Mawr, but had acted as a "spotter" under the supervision of an instructor.

According to Collins, Ryan began taking the extracurricular tumbling class offered by CYC at Bryn Mawr in the spring 1992 term, when he was in the seventh grade. The tumbling class was held two days each week and lasted about 50 minutes. Between 16 and 20 students participated in the tumbling class on a given day. No other teachers or instructors supervised the tumbling class.

Typically, the students would come to the gym and sign in before class. Students were permitted to wear loose-fitting clothes and socks while tumbling. Class would always begin with stretching exercises. The students would then work on whatever gymnastic maneuver Collins planned to practice that day. For the most part, tumbling class consisted of learning and practicing floor maneuvers, including forward rolls, dive rolls, and cartwheels. Collins used the mini-trampoline as part of his regular class on only a few occasions. However, at the end of each class, once the planned instruction was finished, Collins would give the students the last 10 to 20 minutes of the class period to "freelance" and to "show out" or try to impress someone. Generally, the mini-trampoline would be made available to the students during this time. The students would bring the mini-trampoline onto the gym floor and set it up. Collins would then make sure the trampoline was locked in position and a double layer of floor mats was placed around the device.

Once the mini-trampoline was set up, the students would form a line and take turns using it. Some of the students would simply jump off the mini-trampoline, while other students who were more

advanced might do a flip or somersault off the mini-trampoline. On occasion, Collins would "spot" the students. He also taught the students how to "spot" each other. However, Collins did not require that spotters be used every time a student jumped off the mini-trampoline but, rather, only if the student requested one. Collins did not always provide spotters when students performed maneuvers outside of those he was teaching or beyond the student's skill level.

On December 14, 1992, the tumbling class proceeded as usual. Collins was the only instructor for 18 to 22 students. After regular class instruction was finished, the mini-trampoline was set up and the students were allowed to freelance. Ryan got in line and, when it was his turn, made a running approach to the mini-trampoline, jumped off the mini-trampoline into the air, and rotated in a forward flip. He then landed on the mats on his upper body, sustaining injuries and rendering him a quadraplegic. Collins was in the gymnasium at the time of the accident, but was standing a few yards away, talking with a female student. He had not spotted the students using the mini-trampoline, nor had he assigned other students to act as spotters on the day of Ryan's accident. Collins saw Ryan approach the mini-trampoline before the accident and it appeared to him that Ryan was going to attempt a double forward flip. However, Collins was too far away from the mini-trampoline to intervene. After Ryan's accident, Collins immediately sent some students to the office to call 911 for assistance. Collins stayed with Ryan until emergency services arrived and Ryan was taken by ambulance to the hospital.

Ryan Murray testified during his discovery deposition that he never saw Collins "spot" anyone off of the mini-trampoline and that his injury occurred during the "freelance" part of the class. Ryan had only done a forward flip two or three times, and he did not imagine that he could land on his head or neck while doing a forward flip. Ryan imagined falling probably on his knees or incorrectly on his feet, but he did not know a forward flip could cause him to be seriously injured or paralyzed. The worst injury he imagined was probably a broken leg or arm. Ryan testified that when he was injured, his body landed partially on the mat and partially on the floor. Ryan stated that he felt a lot of pain in his neck and could not get up.

The only expert opinion offered by the parties in this case was plaintiffs' retained expert, Marc Rabinoff, a doctor of education and

a tenured professor of human performance sport and leisure studies at Metropolitan State College of Denver in Colorado. He reviewed the statements of witnesses, depositions, photographs, and exhibits provided by plaintiffs' attorneys and rendered a series of opinions on issues of liability in this case. The opinions were furnished to defendants in response to interrogatories, and he was deposed by defendant's attorneys. Dr. Rabinoff had more than 30 years of experience in his field and has testified in several cases as a gymnastics expert.

Dr. Rabinoff testified that it is well known that the mini-trampoline is associated with the risk of spinal cord injury from improperly executed somersaults. According to Dr. Rabinoff, the use of the mini-trampoline requires competent instruction and supervision, and competent spotters for safety and prevention of catastrophic injury. In Dr. Rabinoff's opinion, the tumbling environment was not appropriate for executing somersaults off of a competitive professional mini-trampoline because those maneuvers require considerable skill, spotting, and appropriate landing mats. The minimum mat requirement was not met, and there were absolutely no spotters. According to Dr. Rabinoff, the tumbling program was one of the worst environments he had ever seen and violated every single safety standard. In his opinion, Ryan Murray's injury would have been prevented had more than two inches of mat been used on the landing surface.

Dr. Rabinoff testified it was Collins' job, as the tumbling instructor, to know the maneuver each gymnast intended to execute and that Collins' supervision and instruction were inadequate. In fact, Dr. Rabinoff was shocked that Collins inappropriately rolled Ryan Murray over after the accident, when Ryan had a suspected head and neck injury. In Dr. Rabinoff's opinion, Collins was not qualified to teach tumbling. Dr. Rabinoff indicated that school districts all over the country had banned trampolines from tumbling classes 10 to 15 years before Ryan Murray's accident, that the Chicago schools should not have purchased the trampoline and should not have permitted Collins to use the trampoline in tumbling classes.

Dr. Rabinoff concluded that Collins demonstrated reckless conduct or conscious disregard for the safety of Ryan Murray in that:

> "He elected, made a decision, not to spot, he made a decision to use the mini trampoline improperly; he made a decision to

use mats that are inadequate; he made a decision to conduct that class the way it was conducted, that's reckless to me, and complete disregard for what could potentially happen if a participant, a student in that class doesn't make it all the way around off the mini-tramp."

Dr. Rabinoff also concluded that the Board of Education demonstrated reckless conduct or a conscious disregard for the safety of Ryan Murray in the purchase and use of the mini-trampoline. It was also clear to Dr. Rabinoff that not enough mats were used on the landing area because Ryan Murray landed partially on the mat and partially on the bare gymnasium floor.

Dr. Rabinoff's report was also attached to his deposition and made a part of the record. The report indicates that in expressing his opinions on the issues of liability and probable cause, he relied on his education, training and experience, the other materials furnished to him, and guidelines and warnings on use of mini-trampolines and trampolines issued by the United States Gymnastics Federation (USGF), the American Alliance for Health, Physical Education, Recreation and Dance, the National Collegiate Athletic Association (NCAA), the American Academy of Pediatrics (AAP), the United States Product Safety Commission, and the American Society for Testing and Materials. Dr. Rabinoff's report quotes extensively from the USGF safety manuals in effect at the time of Ryan's injury:

"The U.S.G.F. Gymnastics Safety Manual, Second Edition (1990) requires that spotting should be required for mini-tramp activities. The decision as to when and how spotting should be employed rests with the teacher. Skillful use of 'hands-on spotting' and a safety rig are essential when teaching somersault activities. James Collins failed to adhere to the U.S.G.F. Gymnastics Safety Manual guidelines regarding spotting.

The U.S.G.F. Safety Manual, Second Edition (1990), requires the following landing surface:

A suitable landing surface can be established by placing a 4" landing mat (6' x 12') on top of a base mat (6' x 12'). This matting arrangement, positioned securely against the forward legs of the mini tramp, serves as a minimum recommendation for stand up jumping activities. For

somersault activities, an additional 4" landing mat (6' x 12') placed on top of the above described landing surface or an 8" to 12" safety cushion placed on top of the base mat is recommended.

The Chicago Board of Education failed to supply the appropriate equipment for a landing surface. They further failed to supply a harness or safety belt to Ryan Murray while performing a somersault maneuver.

The wrestling mats used by and set up by Mr. Collins for tumbling class were inappropriate and in clear violation of the U.S.G.F. Gymnastics Safety Manual guidelines.

The U.S.G.F. Gymnastics Safety Manual, Second Edition (1990), requires that use of the mini-tramp occur under the supervision of a trained and qualified instructor. Mr. Collins was not a trained and qualified instructor.

The U.S.G.F. Gymnastics Safety Manual, Second Edition (1990), requires that the instructor inform students about the potential risks associated with the use of the mini-trampoline and that the instructor be sure that the risks and rules are appreciated and understood. Mr. Collins did not inform students of the potential risks and Ryan Murray, a student in his class, did not appreciate and understand the risks of trampolining.

* * *

The U.S.G.F. Gymnastics Safety Manual, Second Edition (1990), clearly warns that improper execution of the somersault is one of the most common causes of serious, catastrophic spinal cord injury. This warning applies to both forward and backward somersaults as well as any of their related dive roll activities. Mr. Collins as a trampoline instructor knew or should have known of this risk.

The failure of Mr. Collins to adhere to the mini-trampoline guidelines enunciated in the U.S.G.F. Gymnastics Safety Manual, demonstrates reckless conduct or conscious disregard for the safety of Ryan Murray and the students in the tumbling class at Bryn Mawr School.

* * *

The Chicago Board of Education did not adequately determine Mr. Collins' qualifications to teach tumbling and mini-tramp.

Risk of serious injury, including quadriplegia, is known to occur from improper execution of a somersault when using a mini-trampoline.

Safety rules are a fundamental part of a safe trampoline program. The rules should be conspicuously and thoroughly understood by each participant in the class. Each student must understand and respect the hazards of the trampoline and the disastrous consequence including paralysis of an improper head and neck landing. Safety must be constantly reinforced. A student does not assume any risk of which he is not aware or does not appreciate. Responsibility rests on the instructor to communicate the risk. Knowledge of the risk is not enough. Appreciation of the risk of serious catastrophic injury, including paralysis, must be supplied to every student by the instructor. The instructor must ascertain that the student understands this risk."

Dr. Rabinoff's opinions and deposition were submitted to the court in response to CYC and Collins' motion for summary judgment alleging that the pleaded facts did not constitute willful and wanton conduct as a matter of law, in addition to contending immunity applied. The Board's motion for summary judgment was limited to the issue of immunity and did not address the willful and wanton conduct issue.

The circuit court ultimately granted defendants' motions for summary judgment. The circuit court held, pursuant to sections 2–201 and 3–108(a) of the Tort Immunity Act (745 ILCS 10/2–201, 3–108(a) (West 1992)), Collins, CYC, and the Board were entitled to immunity from all of plaintiffs' claims. The circuit court, relying on a Fourth District appellate court opinion, *Johnson v. Decatur Park District*, 301 Ill. App. 3d 798 (1998), ruled that section 3–109 of the Act did not serve to "trump" the blanket immunity provided by sections 2–201 and 3–108(a). The court did not revisit the earlier denial of CYC and Collins' motion on the willful and wanton conduct issue.

The appellate court affirmed the circuit court's grant of summary judgment, but held, because trampolining is a hazardous recreational activity, section 3–109 of the Tort Immunity Act is the provision that determines the scope of defendants' immunity. 352 Ill. App. 3d at 105. Accordingly, defendants were immune from all negligence claims, but pursuant to section 3–109(c)(2) of the Act, defendants would not be immune if plaintiff's injury resulted from defendants' willful and wanton conduct. 352 Ill. App. 3d at 105. Nevertheless, the appellate court held, based on the facts drawn from plaintiffs' second amended complaint and the affidavits, depositions, and documents on file, "defendants' actions do not approach the degree of blameworthiness necessary to maintain an action for willful and wanton behavior." 352 Ill. App. 3d at 106.

## ANALYSIS

At the time of Ryan's accident in 1992, sections 2–201 and 3–108(a) of the Tort Immunity Act provided:

"§2–201. Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2–201 (West 1992).

"§3–108. (a) Except as otherwise provided by this Act and subject to subdivision (b) neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property." 745 ILCS 10/3–108(a) (West 1992).

Plaintiffs do not dispute that, under ordinary circumstances, sections 2–201 and 3–108(a) of the Tort Immunity Act would provide defendants with absolute immunity for discretionary and supervisory conduct. Plaintiffs maintain, however, the appellate court correctly determined that section 3–109 of the Tort Immunity Act, that sets forth the scope of immunity afforded local governmental entities and their employees in relation to hazardous recreational activities, applies in this case.

-9-

In 1992, section 3–109 of the Tort Immunity Act provided:

"§3–109. (a) Neither a local public entity nor a public employee is liable to any person who participates in a hazardous recreational activity, including any person who assists the participant, or to any spectator who knew or reasonably should have known the hazardous recreational activity created a substantial risk of injury to himself or herself and was voluntarily in the place of risk, or having the ability to do so failed to leave, for any damage or injury to property or persons arising out of that hazardous recreational activity.

(b) As used in this Section, 'hazardous recreational activity' means a recreational activity conducted on property of a local public entity which creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator.

'Hazardous recreational activity' also means:

* * *

(3) Animal racing, including equestrian competition, archery, bicycle racing or jumping, boat racing, cross-country and downhill skiing, hang gliding, kayaking, motorized vehicle racing, off-road motorcycling or four-wheel driving of any kind, orienteering, pistol and rifle shooting, rock climbing, rocketeering, rodeo, spelunking, sky diving, sport parachuting, body contact sports (i.e., sports in which it is reasonably foreseeable that there will be rough bodily contact with one or more participants), surfing, *trampolining*, tree climbing, tree rope swinging where the person or persons furnished their own rope, water skiing, white water rafting, and wind surfing.

(c) Notwithstanding the provisions of subsection (a), this Section does not limit liability which would otherwise exist for any of the following:

(1) Failure of the local public entity or public employee to guard or warn of a dangerous condition of which it has actual or constructive notice and of which the participant does not have nor can be reasonably expected to have had notice.

(2) An act of willful and wanton conduct by a public entity or a public employee which is a proximate cause of the injury.

-10-

Nothing in this subsection creates a duty of care or basis of liability for personal injury or for damage to personal property." (Emphasis added.) 745 ILCS 10/3–109 (West 1992).

Accordingly, plaintiffs maintain that the immunity afforded defendants is limited by the exceptions found in section 3–109.

Plaintiffs also contend, however, that the appellate court erred when it determined there were no genuine issues of material fact on whether any of defendants' acts or omissions amounted to willful and wanton conduct. Plaintiffs seek reversal and a remand for trial on their claims that defendants acted willfully and wantonly.

As an additional basis for reversal, plaintiffs contend that their second amended complaint contains allegations that defendants failed to guard or warn Ryan of the risks of using a mini-trampoline, bringing their claims within the section 3–109(c)(1) exception to the general grant of immunity. Plaintiffs argue the appellate court erred because it failed to consider whether these allegations survived summary dismissal.

Defendants, on the other hand, argue the appellate court erred when it ruled that the limited immunity afforded by section 3–109 of the Act supercedes the blanket immunity otherwise provided by sections 2–201 and 3–108(a) of the Act. Defendants ask this court to affirm the grant of summary judgment in their favor, but on the grounds that sections 2–201 and 3–108(a) of the Act provide defendants with absolute immunity from all claims that challenge their discretionary and supervisory decisions, whether negligence or willful and wanton conduct is alleged. In the alternative, defendants argue that if section 3–109 applies to limit their immunity to negligent acts, the appellate court's ruling that defendants could not be shown to have acted willfully or wantonly should be affirmed.

This court's review of a circuit court's grant of summary judgment is *de novo*. *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001). Summary judgment is appropriate whenever the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show there is no genuine issue of material fact between the parties and that the moving party is entitled to judgment as a matter of law. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

In granting summary judgment, the circuit court was required to interpret the Tort Immunity Act. The proper construction of a statute is a question of law, subject to *de novo* review. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 385 (1996). The main goal in construing a statute is to ascertain and give effect to the intent of the legislature. *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 387 (1998).

The Tort Immunity Act

In 1965, the General Assembly enacted the Local Governmental and Governmental Employees Tort Immunity Act to replace sovereign immunity, abolished by this court in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959). Both *Molitor* and the Act were validated by the 1970 Illinois Constitution (see Ill. Const. 1970, art. XIII, §4 ("Except as the General Assembly may provide by law, sovereign immunity in this State is abolished")). The Act protects local public entities and public employees from liability arising from the operation of government. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368 (2003). The purpose of the Act is to prevent dissipation of public funds on damage awards in tort cases. 745 ILCS 10/1–101.1(a) (West 1998); *Van Meter*, 207 Ill. 2d at 368.

The Act imposes no duties, but "merely codifies those duties existing at common law, to which the subsequently delineated immunities apply." *Barnett*, 171 Ill. 2d at 386; see also *Moore v. Green*, 219 Ill. 2d 470 (2006). Unless an immunity provision applies, municipalities are liable in tort to the same extent as private parties. See *Barnett*, 171 Ill. 2d at 386.

The overarching issue in this appeal is whether the general grant of immunity and the exceptions for hazardous recreational activity found in section 3–109 of the Act apply and, if so, whether section 3–109 takes precedence over sections 2–201 and 3–108(a) of the Act. We find it does.

Section 2–201 of the Act provides: *"Except as otherwise provided by Statute*, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." (Emphasis added.) 745 ILCS 10/2–201 (West 1992). This section,

-12-

together with section 2–109 (745 ILCS 10/2–109 (West 1992) ("a local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable")), provides both public employees and the public employer with immunity against allegations that challenge discretionary policy determinations. *Arteman v. Clinton Community Unit School District No. 15*, 198 Ill. 2d 475, 487 (2002); *McGurk v. Lincolnway Community School District No. 210*, 287 Ill. App. 3d 1059 (1997). Allegations of a failure to supervise are immunized by section 3–108(a): "*Except as otherwise provided by this Act* and subject to subdivision (b) neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property." (Emphasis added.) 745 ILCS 10/3–108(a) (West 1992). This court has held that these provisions, when applicable, provide immunity from both negligent, as well as willful and wanton conduct. See *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 515 (2006); *Arteman*, 198 Ill. 2d at 487; *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 383 (1998); *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370 (1997). We note that this court's prior determinations on the scope of the immunities provided by sections 2–201 and 3–108(a) were based on the fact that neither provision contained an explicit exception for willful and wanton conduct. Section 3–108(a) was subsequently amended and now contains an exception for willful and wanton conduct. See Pub. Act 90–805 §5, eff. December 2, 1998.

This court has never considered the interplay between the immunities provided by sections 2–201 and 3–108(a) and the limited immunity provided by section 3–109. Our appellate court, however, has considered this issue. In *McGurk*, 287 Ill. App. 3d 1059, a student received head injuries while playing football. The student and his guardian brought suit against the school district, alleging the school district was negligent in its provision and modification of the football helmet used by the student. The appellate court held that the selection or modification of the school equipment was a discretionary determination immunized under section 2–201 of the Tort Immunity Act. However, the appellate court went on to hold:

> "Section 2–201 of the Tort Immunity Act does not provide an absolute blanket of immunity to all public entities; rather, it provides immunity for public employees involved in

determination of public policy or the exercise of discretion, '[e]xcept as otherwise provided by Statute.' [Citation.]

One such exception is found in section 3–109 of the Tort Immunity Act. [Citation.] Section 3–109 provides that public entities and employees are not liable to persons participating in hazardous recreational activities, including body contact sports; however, immunity does not extend to willful and wanton acts that are the proximate causes of injury. [Citation]. Football is unquestionably a body contact sport, *i.e.*, a sport in which it is reasonably foreseeable that there will be rough bodily contact with one or more participants. [Citation.] Thus, under the plain language of section 3–109, the legislature exempted willful and wanton conduct from the immunity extended to cases involving body contact sports such as football." (Emphasis omitted.) *McGurk*, 287 Ill. App. 3d at 1062.

In *Johnson v. Decatur Park District*, 301 Ill. App. 3d 798 (1998), the court came to an opposite conclusion. In *Johnson*, similar to the case at bar, the plaintiff was seriously injured when he overrotated while performing a forward flip off a mini-trampoline in a recreational tumbling class. The court held that the park district was immune from liability against allegations of improper or inadequate supervision pursuant to section 3–108(a) of the Act and that section 3–109(c)(1) was not an exception to this immunity because a condition of the mini-trampoline was not at issue. *Johnson*, 301 Ill. App. 3d at 807. The court then noted:

"Plaintiffs argue that section 3–109(c)(2) of the Act is a limitation on the absolute immunity granted by section 3–108(a). Their argument is that use of a mini trampoline is a hazardous recreational activity and that wilful and wanton conduct is not immunized when it occurs in connection with such activities. They cite no case so holding. They argue that the plain language of section 3–109 compels this conclusion." *Johnson*, 301 Ill. App. 3d at 807.

Resolving this issue, the *Johnson* court held:

"[P]laintiffs have misconstrued the import of section 3–109(c)(2) of the Act. That subsection does not itself create an exception to the absolute immunity granted by section

-14-

3–108(a) of the Act. It simply states that nothing in section 3–109(a) of the Act limits liability 'which would otherwise exist' for an act of wilful and wanton conduct by a public entity or employee that is a proximate cause of injury. Thus, if section 3–108 of the Act does not itself contain an exception for wilful and wanton conduct in connection with supervisory activities, section 3–109(c)(2) of the Act does not apply to provide such an exception, simply because the activity involved may be a hazardous recreational activity." *Johnson*, 301 Ill. App. 3d at 808.

Here, the appellate court rejected the reasoning in *Johnson*, stating its belief that the *Johnson* court did not give sufficient consideration to the "[e]xcept as otherwise provided by this Act" language prefacing the section 3–108(a) immunity provision. 352 Ill. App. 3d at 109. We agree with the appellate court's conclusion.

It is clear from the prefatory language found in both section 3–108(a) and section 2–201 of the Act that the legislature did not intend for the immunities afforded public entities and their employees to be absolute and applicable in all circumstances. In section 3–108(a) the legislature included the conditional language "[e]xcept as otherwise provided by this Act," indicating that the immunity afforded by this provision would not apply if other exceptions or limitations of the Act were applicable. In section 2–201 of the Act the legislature included the prefatory language "except as otherwise provided by Statute," indicating that section 2–201 immunity is contingent upon whether other provisions, either within the Act or some other statute, creates exceptions to or limitations on that immunity.

Although we were not called upon to decide this exact issue in *Epstein*, our comments in *Epstein* lend support for our determination here. In *Epstein*, this court examined the immunity afforded under section 3–108(a) for failure to supervise an activity on public property. We concluded:

"Section 3–108(a) grants immunity '[e]xcept as otherwise provided by this Act.' Ill. Rev. Stat. 1987, ch. 85, par. 3–108(a). *Accordingly, section 3–108(a) by its own terms provides that the only exceptions to its grant of immunity are those set forth elsewhere in the Tort Immunity Act.* Our review of the entire Tort Immunity Act reveals that it provides

exceptions for liability under the Workers' Compensation Act and the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1987, ch. 85, pars. 2–101(c), (d)), *among other things.*" (Emphases added.) *Epstein*, 178 Ill. 2d at 377.

We did not examine the "except as otherwise provided by Statute" provision of section 2–201 in *Epstein*.

Even when an immunity provision does not contain conditional language as found in sections 2–201 and 3–108(a), this court has not hesitated to consider whether the immunity afforded by one provision might be negated or otherwise limited by some other applicable provision. See *Moore*, 219 Ill. 2d 470; *DeSmet*, 219 Ill. 2d at 521 (exception to the application of section 4–102 immunity may be found "where a legislative enactment identifies a specially protected class of individuals to whom statutorily mandated duties are owed"). "It is a well-settled rule of statutory construction that ' "[w]here there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one subject, the particular provision must prevail." ' " *Henrich v. Libertyville High School*, 186 Ill. 2d at 390, quoting *Hernon v. E.W. Corrigan Construction Co.*, 149 Ill. 2d 190, 195 (1992), quoting *Bowes v. City of Chicago*, 3 Ill. 2d 175, 205 (1954). For example, in *Doe v. Calumet City*, 161 Ill. 2d 374 (1994), we reconciled section 4–102 of the Act (providing general immunity to municipalities and police officers regarding the provision of police services) with section 2–202 of the Act and held that an officer's acts or omission in executing or enforcing the law will not be immune if they constitute willful and wanton conduct.

We determine that, in the case at bar, although sections 2–201 and 3–108(a) of the Act would ordinarily provide immunity against the type of allegations advanced by plaintiffs, there is "otherwise provided" in the Act a provision directly addressing the situation giving rise to Ryan's injury. Ryan was injured when he was trampolining during an extracurricular tumbling class.

Trampolining is specifically listed in section 3–109(b)(3) of the Act as a hazardous recreational activity and section 3–109(a) establishes that a public entity or public employee will not be liable to any person who participates in a hazardous recreational activity "for any damage or injury to property or persons arising out of [a person's

voluntary participation in a] hazardous recreational activity" taking place on public property. 745 ILCS 10/3–109(a) (West 1992). This general grant of immunity is subject to two exceptions: (1) if the public entity fails "to guard or warn of a dangerous condition of which [the public entity] has actual or constructive notice and of which the participant does not have nor can be reasonably expected to have had notice," and (2) if an act of willful and wanton conduct by a public entity or a public employee proximately causes the injury. 745 ILCS 10/3–109(c) (West 1992). We conclude that the legislature intended to hold local governmental entities and their employees to a higher standard of care for *hazardous* recreational activities, like trampolining. Thus, in the case at bar, defendants' immunity from liability is subject to the exceptions found in section 3–109(c) of the Act.

Section 3–109(c) Exceptions

Having decided that defendants' immunity from liability is subject to the two exceptions found in section 3–109(c) of the Act, we now address the applicability of those exceptions to this case.

The most fundamental rule in statutory construction is to give effect to the legislative intent. *U.S. Bank National Ass'n v. Clark*, 216 Ill. 2d 334, 346 (2005). The language of the statute is the best indication of the legislature's intent. *U.S. Bank National Ass'n*, 216 Ill. 2d at 346. Statutory language must be given its plain and ordinary meaning, and courts are not free to construe a statute in a manner that alters the plain meaning of the language adopted by the legislature. *U.S. Bank National Ass'n*, 216 Ill. 2d at 346. If the language of a statute is clear, this court must give effect to its plain and ordinary meaning without resort to other aids of statutory construction. *U.S. Bank National Ass'n*, 216 Ill. 2d at 346, citing *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 26 (2005), quoting *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 310 (2001).

Section 1–210 of the Act was adopted in 1986. That section provides: " '[w]illful and wanton conduct' *as used in this Act* means a course of action which shows an actual or deliberate intention to cause harm or which, *if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property*." (Emphasis added.) 745 ILCS 10/1–210 (West 2002). The language of

section 1–210 is clear and unambiguous. Applying fundamental rules of statutory construction, the statutory definition of "willful and wanton conduct" applies to every section of the Act containing that term, including section 3–109(c). The term "willful and wanton" includes a range of mental states from actual or deliberate intent to cause harm, to utter indifference for the safety or property of others, to conscious disregard for the safety of others or their property. In addition, the plain meaning of section 1–210 is entirely consistent with this court's long-standing common law precedents.

Defendants argue that the 1986 amendments to the Tort Immunity Act narrowed the definition of "willful and wanton conduct" to deliberate or conscious conduct disregarding the safety of others and that the pleadings and facts adduced in discovery do not meet that narrow definition. According to defendants, the common law definition of "willful and wanton" does not apply in Tort Immunity Act cases. We disagree with defendants. A review of this court's precedent defining willful and wanton conduct is instructive.

In *Schneiderman v. Interstate Transit Lines, Inc.*, 394 Ill. 569 (1946), this court explained willful and wanton conduct as follows:

> "A wilful and wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care. [Citations.] The question whether a personal injury has been inflicted by wilful or wanton conduct is a question of fact to be determined by the jury." *Schneiderman*, 394 Ill. at 583.

In *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429 (1992), this court was presented with the question of whether the plaintiff's alleged contributory negligence could be compared with the particularly egregious willful and wanton conduct of the police officers involved, thus entitling the municipality to a reduction in the damages award reflecting the plaintiff's percentage of fault. In interpreting section 1–210 of the Tort Immunity Act, the court stated it was evident "that the legislature did not intend to shield municipalities whose conduct shows a deliberate intention to cause

-18-

harm *or a complete indifference to the safety of others*." (Emphasis added.) *Burke*, 148 Ill. 2d at 443. The *Burke* court observed:

> "We can find no indication in the Act that the legislature, balancing its dual interest in protecting municipalities and protecting the people, intended to reject the deterrent of placing willful and wanton conduct beyond the reach of comparison with mere negligence. However, as the legislature has not spoken definitively, *we turn for guidance to common law precedents*." (Emphasis added.) *Burke*, 148 Ill. 2d at 443.

In the confined context of the issue of comparative negligence, the court initially noted that the Illinois Pattern Jury Instructions, Civil, No. 14.01 (2d ed. 1971), definition of willful and wanton conduct was "virtually identical" to the definition found in section 1–210 of the Act and to the pleading requirements for willful and wanton conduct. *Burke*, 148 Ill. 2d at 448, citing *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill. 2d 497, 518 (1989). Citing earlier authority, the court further noted that, in the context of punitive damages, willful and wanton misconduct " ' "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." ' [Citation.]" *Burke*, 148 Ill. 2d at 448.

The court acknowledged that Illinois appellate court cases have found willful and wanton conduct where the circumstances involved a " ' "conscious and deliberate disregard for the rights or safety of others." ' " *Burke*, 148 Ill. 2d at 449, quoting *Bresland v. Ideal Roller & Graphics Co.*, 150 Ill. App. 3d 445, 458 (1986), quoting *Morrow v. L.A. Goldschmidt Associates, Inc.*, 126 Ill. App. 3d 1089, 1095 (1984). The court termed this type of willful and wanton conduct "quasi-intentional." *Burke*, 148 Ill. 2d at 449.

The court then examined and adopted the Restatement (Second) of Torts §500 (1965) view that "there is a qualitative difference between negligence and willful and wanton conduct. *Burke*, 148 Ill. 2d at 450. The court noted that the Restatement uses the term "reckless conduct," rather than "willful and wanton conduct." *Burke*, 148 Ill. 2d at 449.

After carefully considering Illinois precedent, federal decisions, and cases from our sister states, as well as learned treatises and relevant statutes, the court concluded that "[w]illful and wanton

conduct is found where an act was done ' "with actual intention or with a conscious disregard *or indifference for the consequences* when the known safety of other persons was involved." ' " (Emphasis added.) *Burke*, 148 Ill. 2d at 451, quoting *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 430 (1980), quoting *Myers v. Krajefska*, 8 Ill. 2d 322, 328-29 (1956). The court indicated that "[a] determination of willful and wanton conduct will be based on the facts of any given case." *Burke*, 148 Ill. 2d at 451. The court ultimately held that "[b]ecause of the qualitative difference between simple negligence and willful and wanton conduct, and because willful and wanton conduct carries a degree of opprobrium not found in merely negligent behavior," the contributory negligence of the plaintiff could not be compared with the willful and wanton conduct of the municipality. *Burke*, 148 Ill. 2d at 451-52.

This court did not imply by its holding in *Burke* that cases subject to tort immunity defenses require application of a more restrictive definition of willful and wanton conduct than applicable at common law. In *Burke*, a jury had already found the municipality liable for willful and wanton conduct and that finding was not challenged on appeal. Rather, *Burke* simply held that a defendant's liability for willful and wanton conduct could not be reduced by a plaintiff's contributory negligence.

In *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267 (1994), this court considered the issue of whether a joint tortfeasor found guilty of willful and wanton conduct could seek contribution against another joint tortfeasor liable for only negligent conduct. In a plurality opinion, this court acknowledged legal commentary critical of *Burke*, and determined that "continued adherence to the full scope of the *Burke* decision could lead to harsh and unjust results supported by neither the clear terms of, nor underlying purposes for, our laws regarding comparative fault and contribution." *Ziarko*, 161 Ill. 2d at 278.

The *Ziarko* plurality noted that the willful and wanton conduct in *Burke* approached the degree of moral blame attached to intentional harm (*Ziarko*, 161 Ill. 2d at 273), but nevertheless held that "conduct characterized as willful and wanton may be proven where the acts have been less than intentional –*i.e.*, when there has been 'a failure, after knowledge of impending danger, to exercise ordinary care to

prevent' the danger, or a 'failure to discover the danger through ***
carelessness when it could have been discovered by the exercise of
ordinary care.' " *Ziarko*, 161 Ill. 2d at 274, quoting *Schneiderman*,
394 Ill. at 583. Accordingly, the court found that contribution
principles could be applied in cases when one defendant is found guilty
of negligence and another of willful and wanton acts not rising to the
level of intentional misconduct. *Ziarko*, 161 Ill. 2d at 280.

One year after the *Ziarko* decision, a majority of this court
expressly adhered to the *Ziarko* analysis of willful and wanton
conduct. *Poole v. City of Rolling Meadows*, 167 Ill. 2d 41, 48 (1995).
*Poole* involved both a federal civil rights claim and a state claim
against the City of Rolling Meadows, based on the allegedly willful
and wanton misconduct of a police officer who shot the plaintiff by
mistake while investigating a break-in at the home of the plaintiff's
mother. A jury found for the officer on the federal claim and for the
plaintiff on the state willful and wanton misconduct claim, and the trial
court reduced the plaintiff's award by his contributory negligence. The
trial court then granted the plaintiff's motion to reinstate the jury
award, accepting the plaintiff's argument that damages based on
willful and wanton misconduct would not be reduced by a plaintiff's
contributory negligence. This court noted that the jury did not
characterize the defendants' misconduct as either intentional or
reckless, and therefore concluded that the trial court erred in
reinstating the full verdict in favor of the plaintiff without reduction
for his claimed contributory fault. *Poole*, 167 Ill. 2d at 49-50.

In *American National Bank & Trust Co. v. City of Chicago*, 192
Ill. 2d 274 (2000), this court reversed a trial court's determination that
a plaintiff's complaint did not sufficiently allege willful and wanton
misconduct. The 11-count complaint sought recovery from the City
under the Wrongful Death and Survival Act, alleging negligence and
willful and wanton misconduct. The complaint also sought recovery
under a federal civil rights provision. The complaint alleged that a 911
operator acted willfully and wantonly in not keeping the decedent, an
apparent heart attack victim, on the line while paramedics responded
and also claimed the paramedics acted willfully and wantonly in failing
to try the decedent's unlocked door and enter her apartment, in
violation of express instructions in their training materials. *American
National Bank*, 192 Ill. 2d at 277. The defendants claimed immunity

from liability for the decedent's death pursuant to the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/1 *et seq.* (West 1994)).

This court rejected the defendants' tort immunity defense (*American National Bank*, 192 Ill. 2d at 280-81) and then addressed the sufficiency of the complaint. Citing the *Ziarko* explanation of willful and wanton conduct, the court held the allegations in the plaintiff's complaint were sufficient to withstand a motion to dismiss and whether the defendants' conduct was wilful and wanton was a question for the trier of fact *American National Bank*, 192 Ill. 2d at 285-86.

As plaintiffs note in their reply brief, when the General Assembly added the definition of willful and wanton conduct to the Tort Immunity Act by Public Act 84–1431, article I, section 2, effective November 25, 1986, it copied the exact language of the applicable jury instruction (Illinois Pattern Jury Instructions, Civil, No. 14.01 (3d ed. 1993) (IPI Civil 3d No. 14.01)). We agree with plaintiffs that the definition of willful and wanton had a settled judicial meaning at that time. One of the primary principles of statutory construction establishes the presumption that the legislature intended the statute to be interpreted in accordance with prior case law:

> "When a statute employs words having a well-known legal significance, courts will, in the absence of any expression to the contrary, assume that the legislature intended the words to have that meaning." *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 364 (1986).

This court has consistently applied the definition of willful and wanton conduct stated in IPI Civil 3d No. 14.01 to all cases, whether on a statutory immunity provision, or at common law. A comparison of IPI Civil 3d No. 14.01 and the 1986 statutory language of section 1–210 of the Tort Immunity Act, compels the conclusion that the statute, containing language virtually identical to IPI Civil 3d No. 14.01, is a codification of existing law. In fact, the comment to IPI Civil 3d No. 14.01 specifically notes that "[a] similar definition of willful and wanton conduct is found in §1–210 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1–210)." IPI Civil 3d No. 14.01, Comment. We find nothing in the Act indicating the General Assembly intended the definition of

"willful and wanton" conduct to differ from its well-established legal meaning.

We note that the legislative history of the 1986 amendment supports our conclusion. During the legislative debates, Representative Greiman stated that "the law was previously and remains that you have to have willful and wanton for them to be liable and that is, indeed, what it remains. It was the law and is the law still." 84th Ill. Gen. Assem., House Proceedings, June 30, 1986, at 34 (statements of Representative Greiman).

Between 1986, when section 1–210 was enacted, and 1998, when the legislature again amended this specific section, this court decided *Ziarko*, 161 Ill. 2d 267, *Poole*, 167 Ill. 2d 41, and *Pfister v. Shusta*, 167 Ill. 2d 417 (1995). Each of these cases made clear that this court drew no distinction between the Tort Immunity Act and common law definitions of willful and wanton conduct. The legislature is deemed to have known of those cases and acquiesced in them. *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 403 (2005). Consequently, we reject defendants' argument that the 1986 amendments to the Tort Immunity Act imposed a heightened willful and wanton standard. We hold that the 1986 amendments to the Tort Immunity Act did not change the definition as explained and interpreted by this court.

Defendants also argue that the 1998 amendment to the Tort Immunity Act shows the General Assembly's intent to replace the common law definition of willful and wanton conduct with a heightened definition more akin to intentional misconduct. The 1998 amendment to section 1–210 added the following language:

> "This definition shall apply in any case where a 'willful and wanton' exception is incorporated into any immunity under this Act." 745 ILCS 10/1–210 (West 1998).

Defendants acknowledge, however, that the 1998 amendments to the Tort Immunity Act were not in effect at the time of Ryan's accident. Thus, the legislative intent of the 1998 amendments is not properly before this court, and it would be inappropriate for this court to consider the legislative intent in passing legislation that was not even in effect at the time of Ryan's accident. Accordingly, we express no opinion on the effect, if any, of the 1998 amendment on willful and wanton liability governed by the Tort Immunity Act.

CYC and Collins argue that in enacting section 3–109(c)(2) the legislature declined to include "omissions" within the ambit of the exception to tort immunity. CYC and Collins contrast this section with the complete immunity granted in cases of a "failure to supervise an activity" under section 3–108(a) and conclude that the phrase "act of willful and wanton conduct" in section 3–109(c)(2) does not include "failure to supervise" and it refers instead to overt activity. CYC and Collins offer no authority for this proposition.

In providing for construction and application of the Tort Immunity Act, the legislature specifically defined "willful and wanton conduct" in section 1–210 as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." The language of showing an "utter indifference to or conscious disregard for safety of others or their property" unquestionably contemplates conduct by omission. Thus, there can be no serious contention that this definition does not include the failure to take action when that omission proximately causes injury.

In other contexts, the legislature had provided that the term "act" is not limited to overt activity. For instance, the word "act" is specifically defined in the Criminal Code to include "a failure or omission to take action." 720 ILCS 5/5–2 (West 1992). The Domestic Violence Act provides that "Any act of omission or commission by any law enforcement officer *** shall not impose civil liability upon the law enforcement officer *** unless the act is a result of willful or wanton misconduct." 750 ILCS 60/305 (West 1992). The legislature thus expressly provided a willful and wanton exception applicable to acts of omission as well as overt conduct. We conclude that there is no basis in the law for CYC and Collins' restrictive definition of the phrase "act of willful and wanton conduct" as used in section 3–109(c)(2) and we reject this argument.

Plaintiffs also claim that the facts alleged in their amended complaint bring this case within the "[f]ailure *** to guard or warn of a dangerous condition" exception to the general grant of immunity found in section 3–109(c)(1) of the Act (745 ILCS 10/3–109(c)(1) (West 1992)). Plaintiffs acknowledge that the appellate court did not expressly address the "failure to guard or warn" exception to immunity. We find that this issue was not fully briefed and argued by

the parties and, therefore, decline to address whether the section 3–109(c)(1) exception to immunity is applicable in this case.

We now consider whether the appellate court erred in affirming the circuit court by finding that defendants' conduct was not willful and wanton. Plaintiffs contend the appellate court erred by granting summary judgment in defendants' favor. Plaintiffs maintain that the question of whether defendants' conduct was willful and wanton is a question of fact for the jury. *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 326 (1995). Plaintiffs assert that the wealth of materials submitted in response to defendants' motions for summary judgment demonstrates "a genuine and material triable issue of fact" on the question of defendants' willful and wanton conduct. Specifically, plaintiffs argue willful and wanton conduct is present based on the evidence that defendants, though aware of the possibility of serious injury associated with trampolining, exhibited a reckless disregard for Ryan's safety; that defendants either recklessly or carelessly failed to take steps to discover the risks posed by the use of a mini-trampoline; and that defendants failed to exercise care to prevent Ryan's injury. Plaintiffs note that Collins was not licensed or certified to teach trampolining and that he had limited experience with the device. Plaintiffs argue that Collins was reckless because he allowed the students to use the mini-trampoline to "free-lance" without instruction or supervision and to perform flips without spotters or safety harnesses and without appropriate trampolining mats.

As we have noted, in general, "[w]hether conduct is 'willful and wanton' is ultimately a question of fact for the jury." *Doe v. Calumet City*, 161 Ill. 2d at 390; *Calloway*, 168 Ill. 2d at 326. In some circumstances, it is necessary for the court to decide as a matter of law whether the plaintiff's complaint alleges sufficient facts of a defendant's willful and wanton conduct to create a jury question. *Calumet City*, 161 Ill. 2d at 390.

Recently, in *Doe v. Chicago Board of Education*, 213 Ill. 2d 19 (2004), this court affirmed the denial of a section 2–615 motion to dismiss a complaint seeking damages for a special needs bus passenger, injured in an assault by a fellow passenger while traveling to school in a bus provided by the school board. The Board's immunity defense was rejected, and the complaint, alleging willful and wanton misconduct, was held sufficient to charge the Board with

knowledge of both the special needs of the victim and the dangerous propensities of the assailant. The issue of willful and wanton conduct by the Board was thus deemed within the province of the jury. *Doe*, 213 Ill. 2d at 29.

Summary judgment is appropriate only when the pleadings, depositions and affidavits in the record show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Sollami v. Eaton*, 201 Ill. 2d 1, 6 (2002). It is a drastic means of disposing of litigation, and this court has a duty to construe the record strictly against the movant and liberally in favor of the nonmoving party. *Majca v. Beekil*, 183 Ill. 2d 407, 416 (1998). Summary judgment should not be allowed unless the moving party's right to judgment is clear from doubt, because plaintiffs are not required to prove their cases at the summary judgment stage. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 424 (1998). Applying these principles to a review of the summary judgment pleadings in this case establishes that a triable issue of material fact exists on whether defendants are guilty of willful and wanton conduct.

The evidence demonstrates that it is well known that use of a mini-trampoline is associated with the risk of spinal cord injury from improperly executed somersaults and that catastrophic injuries, including quadraplegia, can result from an improperly executed somersault. The evidence also indicates that the tumbling/trampoline program was not supervised by an instructor with professional preparation in teaching trampolining, nor was it taught in a proper manner with reminders of the risk of injury incorporated into the teaching process. The evidence also indicated that trained spotters and safety equipment were not provided at all times, and none of the United States Gymnastic Federation Safety Manual guidelines were followed. Hence, genuine and material triable issues of fact exist in this case on the question of whether defendants are guilty of willful and wanton conduct. Under the circumstances, it was error for the appellate court to affirm summary judgment.


CONCLUSION

For the foregoing reasons, we reverse the judgment of the appellate court and the circuit court's grant of summary judgment in

favor of defendants and remand to the circuit court for further proceedings consistent with this opinion.

*Reversed and remanded.*