THIRD DIVISION
October 22, 2008

No. 1-08-0786

| | | |
|---|---|---|
| DANIEL MITCHELL, a Minor, by his Legal Guardian, | ) | Appeal from |
| Shirley Lambert, | ) | the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 06 L 5486 |
| | ) | |
| SPECIAL EDUCATION JOINT AGREEMENT | ) | |
| SCHOOL DISTRICT NO. 208, | ) | Honorable |
| | ) | John A. Ward, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE THEIS delivered the opinion of the court:

Plaintiff, Daniel Mitchell, a minor, by his legal guardian, Shirley Lambert, appeals from

the order of the circuit court of Cook County granting the motion for summary judgment filed by

defendant, the Special Education Joint Agreement School District No. 208 (the school).  The

circuit court found that Daniel failed to raise a genuine issue of material fact regarding whether

school employees acted willfully and wantonly in failing to supervise him.  Daniel challenges

that conclusion on appeal.  We affirm.

Daniel suffers from Downs Syndrome, is profoundly mentally delayed, is not able to

speak, and is severely hearing impaired.  He also requires assistance with all of his daily

functions, including with meals.  Daniel was a special education student at the defendant school,

which is a public school serving students with special needs from 15 Chicago area school districts.

Through Lambert, Daniel commenced the present action against the school contending that the school willfully and wantonly failed to properly monitor him during breakfast on May 31, 2005, causing him to choke and sustain injury. Daniel sought $50,000 for his injuries.

The school subsequently filed a motion for summary judgment contending that Daniel could not establish, as a matter of law, that school employees had acted willfully and wantonly in failing to supervise him. The school attached the following depositions and other items to its motion for summary judgment.

In her deposition, Lambert testified that Daniel requires one-on-one supervision while he is eating. Otherwise, she explained, he will eat too quickly and put too much food into his mouth. To prevent this from occurring, Lambert will cut Daniel's food into small pieces and sit with him while he eats to make sure he paces himself. She added that if Daniel is not monitored, he will try to take food from others. However, once Daniel has finished eating, he will not try to take more food.

Benoit Runyan, the school principal, testified that students at the school have many diverse, specific needs. Accordingly, each student has an individualized education plan and school staff meet on a biweekly basis to discuss students' needs and ensure that those needs are met. Regarding Daniel, Runyan explained that the school psychologist prepared a report assessing him. Although Daniel was 16 years old at the time in question, the report disclosed that Daniel's social age was 12 months, his academic age was 11 months, and his physical age

was 34 months. Like a toddler, Daniel could maneuver around his environment, pick up items, and sense hot and cold. Thus, Daniel could not be expected to care for his own safety. Although Daniel was not able to communicate verbally, he was able to communicate via hand gestures. He specifically understood a hand gesture for "stop."

The school and school staff were also aware of Daniel's specific needs related to food. They understood that Daniel's food had to be cut into small pieces and given to him gradually in small portions. Due to Daniel's "attraction to food," school staff also understood that a large amount of food could not be set out in Daniel's presence. Runyon added that Daniel had even tried to take food from the garbage can on his way out of the school cafeteria. Daniel had also sat down on the cafeteria floor and refused to leave. On another occasion, Daniel was given a plate of Chinese food and a slice of bread. Daniel began stuffing "forkfulls" of food into his mouth rapidly. Daniel's teacher had to intervene and grab Daniel's hand to stop him from taking another bite until after he had chewed and swallowed the previous one. When the teacher looked away "for a second," Daniel grabbed the bread and stuffed the entire piece into his mouth. As a result of Daniel's "food issues," Daniel's teacher or paraprofessional aide would cut his food and monitor his eating to ensure that he paced himself and did not take food from others. However, Runyon made clear that Daniel had never choked on food before the May 31, 2005, incident.

Chris Peterson, Daniel's teacher at the time in question, testified that at the beginning of the school year, he was given the individualized education plans for each of his students. He was also given other information on their specific needs. Peterson specifically remembered Daniel and testified that he had been made aware of Daniel's tendency to gorge food if he were left

unattended. He was also aware of the protective measures, such as cutting Daniel's food, that needed to be taken for Daniel at mealtimes. Peterson explained that if Daniel's food were cut into small pieces, Daniel could be left alone to pace himself while eating. Staff would also hold Daniel's hand and walk him to the cafeteria so that he would not run away and take food from others. Peterson added that this was necessary because Daniel was strong and quick.

Peterson recalled one specific incident when another teacher with a plate of hot dogs unknowingly walked by as Peterson was walking Daniel to the cafeteria. Daniel immediately seized the hot dogs and stuffed them into his mouth. However, Daniel did not choke. Instead, he "just swallowed [the hot dogs] right down *** without blinking," which "amazed" Peterson.

Peterson added that they were required to keep Daniel in the least restrictive environment at school. Therefore, they could not isolate him during mealtime, nor could they physically restrain him. Thus, staff would use "common sense" and monitor Daniel.

Frankie Ross, Daniel's paraprofessional aide, testified that she was also aware of Daniel's issues with food. Before working with Daniel, Ross became familiar with Daniel's individualized education plan and spoke with Daniel's paraprofessional aide from the previous school year. She added that Daniel was severely mentally impaired and required assistance with "everything."

At mealtime, Ross was charged with the task of cutting Daniel's food into small pieces. She would also sit with him one-on-one while he ate to ensure that he would pace himself and not take food from others. If Daniel ate too quickly or tried to sneak food away from other students, Ross would hold Daniel's hand to stop the behavior. Ross recalled two specific

occasions when Daniel tried to slide snacks away from a student seated nearby.

Ross and Peterson testified that on May 31, 2005, one of the students in Daniel's class was celebrating a birthday. Hostess "Suzy Q" cupcakes were provided to each student in the class as a treat along with their breakfast. Ross explained that this was generally what would occur when any student was celebrating a birthday. There had been at least one prior birthday in Daniel's class that year, and Daniel had handled the situation well.

On this occasion, Ross cut Daniel's cupcake into small, bite-sized pieces and sat next to him while he ate. There were seven to nine students in Daniel's class, and another student was seated on the opposite side of the table at which they were sitting. After finishing his cupcake, Daniel ate cereal. Daniel created a "small mess" by spooning up the milk, so Ross stepped backwards several feet to a sink to retrieve a paper towel to clean up the mess. Ross stepped backward because she knew that if Daniel were not being watched, he would try to sneak food from another student. However, at this point, Peterson and Ross both believed that the other students had finished eating their cupcakes. Peterson also explained that because Daniel had his own cereal in front of him, there was no motivation for him to leave his seat. Accordingly, Peterson remained behind his desk and began marking his attendance sheet.

Nevertheless, when Ross stepped back to the sink and began to wet a paper towel, Daniel got up out of his seat, ran around the table, grabbed at least one other cupcake that had been left on the table, and stuffed the cupcake into his mouth. Peterson and Ross, seeing Daniel moving quickly toward the other students' side of the table, immediately went after him. Ross called for him to stop, but Daniel did not obey. Peterson and Ross both reached him at the same time, but

Daniel already had the cupcake in his mouth. These events unfolded in a matter of seconds. They tried to get Daniel to spit the cupcake out, but were unsuccessful. Daniel began to gag and choke. Peterson attempted to perform the Heimlich maneuver, then called the school nurses. The nurses arrived shortly thereafter, but were unable to do anything for Daniel. They called an ambulance and Daniel was taken to the hospital.

Lambert testified that Daniel remained in an induced coma for some time. After he awakened, he had some difficulty walking. Daniel incurred $80,000 in medical expenses, which were paid by public aid.

Daniel responded to the school's motion for summary judgment by contending that because the school was aware of his issues with food, it was a conscious disregard for his safety to take even a few steps away from him at mealtime. Daniel did not attach any depositions or other materials to his response.

Following argument, the court granted the school's motion. The court specifically found that the "warm and nurturing" care the school provided to Daniel could not, as a matter of law, amount to willful and wanton conduct. Daniel subsequently filed this timely appeal.

Daniel now contends that the circuit court erred in granting the school's motion for summary judgment because the depositions and other items presented, when viewed in the light most favorable to him, raised a genuine issue of material fact as to whether the school's conduct was willful and wanton. He specifically asserts that the school and its staff knew of his issues with food and that their actions in even momentarily stepping away from him constituted a conscious disregard for his safety.

"Summary judgment is appropriate where the pleadings, depositions, admissions and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2006); Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co., 227 Ill. 2d 102, 106, 879 N.E.2d 305, 308 (2007). Indeed, if the movant supplies facts which, if not contradicted, would warrant judgment in its favor as a matter of law, the nonmoving party cannot rest on its pleadings to create a genuine issue of material fact. Abrams v. City of Chicago, 211 Ill. 2d 251, 257, 811 N.E.2d 670, 674 (2004). Nevertheless, summary judgment should not be allowed unless the movant's right to judgment is clear and free from doubt. Murray v. Chicago Youth Center, 224 Ill. 2d 213, 246, 864 N.E.2d 176, 195 (2007). We review a circuit court's order granting summary judgment de novo. Kajima Construction Services, Inc., 227 Ill. 2d at 106, 879 N.E.2d at 308.

In order to protect public funds from being dissipated by damage awards in tort cases, the Local Government and Governmental Employees Tort Immunity Act (the Act) (745 ILCS 10/1-101 et seq. (West 2006)) was enacted to shield local public entities and public employees from liability for ordinary negligence committed during the exercise of their duties. See generally Murray, 224 Ill. 2d at 229-30, 864 N.E.2d at 185-86. Specifically, section 3-108(a) provides that, "Except as otherwise provided by this Act, neither a local public entity nor a public employee who undertakes to supervise an activity on or the use of any public property is liable for an injury unless the local public entity or public employee is guilty of willful and wanton conduct in its supervision proximately causing such injury." 745 ILCS 10/3-108(a) (West 2006). The Act

further defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2006).

Generally, whether conduct was willful and wanton is a question of fact for a jury to decide. Murray, 224 Ill. 2d at 245, 864 N.E.2d at 194. However, where the record shows absolutely no evidence that the defendant displayed either an utter indifference to or a conscious disregard for the plaintiff's safety, then the court may properly decide the issue as a matter of law. See, e.g., Stiff v. Eastern Illinois Area of Special Education, 279 Ill. App. 3d 1076, 1082, 666 N.E.2d 343, 346 (1996). For example, in Stiff, the court directed a verdict for the defendant school after the plaintiff presented no evidence that school staff consciously disregarded her safety, and this court affirmed that determination. Stiff, 279 Ill. App. 3d at 1082, 666 N.E.2d at 346. The plaintiff in that case was a seven-year-old epileptic special education student requiring adaptations to improve her balance and coordination. Stiff, 279 Ill. App. 3d at 1079, 666 N.E.2d at 344. On the occasion in question, the plaintiff was taken on a field trip to hike in a state park when the group came to a bridge which had a fallen tree lying across the hand rails. Stiff, 279 Ill. App. 3d at 1079, 666 N.E.2d at 344. The plaintiff's adaptive physical education teacher directed the plaintiff to proceed under the tree while another teacher and a teacher's aide monitored the plaintiff from a few inches away; however, as she attempted to circumvent the tree, the plaintiff's leg buckled and she fell off the bridge, sustaining injury. Stiff, 279 Ill. App. 3d at 1079, 666 N.E.2d at 344-45. The court found that because the plaintiff's teachers were mere inches away from her while monitoring her progress, the school staff's actions could not be said to have been

an "utter disregard" for the plaintiff's safety. Stiff, 279 Ill. App. 3d at 1082, 666 N.E.2d at 346.

Here, Daniel does not claim that the school intended to harm him but, rather, that it consciously disregarded his safety during the May 31, 2005, breakfast birthday party. We disagree. As in Stiff, school staff maintained close supervision over Daniel, evincing concern for his safety. At the time in question, Peterson and Ross both believed that the other students had finished their cupcakes and that Daniel would not be motivated to take food from others when he had his own cereal to finish. Nevertheless, being aware of Daniel's issues, Ross continued to monitor Daniel when she stepped back a few feet to the sink without turning her back on him. These actions by school staff showed a concern for Daniel's safety. Further, as soon as Daniel left his seat, both Peterson and Ross acted to intercede and attempted to stop Daniel; however, Daniel did not obey. Once again, we cannot say that the school staff's actions showed an "utter disregard" for Daniel's safety, and Daniel came forward with no evidence to the contrary.

In reaching this conclusion, we find the cases relied upon by Daniel, Jackson v. Chicago Board of Education, 192 Ill. App. 3d 1093, 549 N.E.2d 829 (1989), and Gammon v. Edwardsville Community Unit School District No. 7, 82 Ill. App. 3d 586, 403 N.E.2d 43 (1980), to be distinguishable from the present case. In both of those cases, school staff did absolutely nothing to protect the students in question, in that they left them completely unattended and ignored a credible threat of violence by another student. Jackson, 192 Ill. App. 3d at 1095-96, 549 N.E.2d at 830; Gammon, 82 Ill. App. 3d at 587-88, 403 N.E.2d at 44-45.

For these reasons, we affirm the circuit court's order granting the school's motion for summary judgment.

1-08-0786

Affirmed.

GREIMAN and QUINN, JJ., concur.

**DANIEL MITCHELL, a Minor by his Legal Guardian, Shirley Lambert,**

      **Plaintiff-Appellant,**

      **v.**

**SPECIAL EDUCATION JOINT AGREEMENT SCHOOL DISTRICT NO. 208,**

      **Defendant-Appellee.**

**No. 1-08-0786**

**Appellate Court of Illinois
First District, Third Division**

**Filed: October 22, 2008**

**JUSTICE THEIS delivered the opinion of the court.**

**Greiman and Quinn, JJ., concur.**

**Appeal from the Circuit Court of Cook County
Honorable John A. Ward, Judge Presiding**

| | |
|---|---|
| **For PLAINTIFF-APPELLANT,** | **John A. Stefani**<br>**Joseph, Lichtenstein & Levinson**<br>**221 N. LaSalle St., Suite 2119**<br>**Chicago, IL 60601** |
| **For DEFENDANT-APPELLEE,** | **William F. Gleason**<br>**Hauser, Izzo, DeTella & Petrarca, LLC**<br>**19730 Governors Highway, Suite 10**<br>**Flossmoor, IL 60422** |