NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220025-U

NO. 4-22-0025

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 22, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MARY YARBOROUGH, Individually and as Special Administrator of the Estate of Eric M. Jones, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Sangamon County |
| v. | ) | No. 08L176 |
| THE CITY OF SPRINGFIELD, | ) | |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The trial court did not err in denying defendant's motion for judgment notwithstanding the verdict.

¶ 2         In July 2008, plaintiff, Mary Yarborough, individually and as special administrator of the estate of her 16-year-old son, Eric M. Jones, filed the wrongful death suit at issue in this case against City Water Light and Power (CWLP) and the City of Springfield (City) after Eric drowned at a public beach at Lake Springfield (the beach). In January 2015, plaintiff filed a second-amended complaint which named the City as the sole defendant. In February 2015, a jury returned a verdict in plaintiff's favor. The City appealed, and this court reversed the trial court's judgment and remanded the case for further proceedings, holding the trial court abused its discretion in admitting as evidence an internal policy regarding lifeguard placement at the beach. *Yarborough v. City of Springfield*, 2016 IL App (4th) 150336-U, ¶ 75. On remand, after a second

trial, a jury again returned a verdict in plaintiff's favor. On January 5, 2022, the trial court denied the City's motion for judgment notwithstanding the verdict. The City appeals, arguing its motion for judgment notwithstanding the verdict should have been granted because it is entitled to immunity pursuant to the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/1-101 *et seq.* (West 2006)). We affirm.

¶ 3                                     I. BACKGROUND

¶ 4        At the second jury trial in May 2021, the parties stipulated the employees at CWLP and the beach were agents of the City. The parties also stipulated Eric Jones died from asphyxia by drowning.

¶ 5        Douglas England testified he was the utility property manager for CWLP and involved in the operation of the beach when Eric drowned in July 2007 but was not present and had no personal knowledge of what occurred. England was not a lifeguard and had no expertise with regard to a lifeguard's job. Prior to overseeing the beach, he had never managed an open-water facility or a pool. England testified he did not hire anyone at the beach but made sure the beach employees had what they needed to perform their duties. When the beach was open, he would check in once or twice per day. His position outranked the beach managers and lifeguards. He had the authority to direct the beach employees. However, he was not involved in the training or certification of the lifeguards. He did not know if the lifeguards were given training manuals.

¶ 6        England testified the beach managers made sure the beach operated appropriately and were to report any serious problems to England. Like England, the beach managers also did not supervise the lifeguards with regard to rescues, supervising the patrons, or on-site lifeguard training. England did not know if the beach managers in 2007 were certified lifeguards.

¶ 7        England believed a procedure was in place for locating missing persons and bathers

at the time Eric drowned, which included clearing the water, checking the facilities for the person, and starting a line search in the water if the person was not found. He had heard an emergency action plan (EAP) being discussed but did not recall ever seeing one at the beach. England claimed a document called "Emergency Procedures" was either given to the beach managers and lifeguards or posted in the office or lifeguard room. He had not found any other lists of emergency procedures. He expected the lifeguards and beach managers would have known of these emergency procedures. The "Emergency Procedures" document indicated lifeguards should blow their whistle one time to warn a patron, two times to get the attention of the other guards, and three times for a true emergency such as a lost child or drowning patron. England testified a line search, where the guards linked arms and walked through the water, would be the best type of search to use at the beach because of the opaque water. England believed beach patrons should have been able to rely on the lifeguards performing their jobs. However, he also noted signs were posted in the locker rooms and the water instructing novice swimmers to stay in shallow water. In addition, a buoy line separated the shallow water from the deeper water.

¶ 8    Three to four weeks before Eric's death, after a patron complained to the mayor's office about what the patron believed to be an inappropriate number of lifeguards at the beach, England prepared a handwritten memo, which he said reflected the policy which had been in place during his tenure as the utility property manager. The memo indicated a lifeguard needed to be in the area of the diving board when used, the slide when used, and the middle area of the water if someone was in the water there. He said the lifeguards and beach managers should have been familiar with the information in the memo. Plaintiff's counsel and England then had the following exchange:

"Q. Now I'm going out on a limb here in saying that you underlined the

- 3 -

word 'must' and the manner in which you delivered this memo, half dozen or more [copies] to the beach personally, you were a little upset about the complaint?

A. I don't know if I was upset. I was just wanting to reiterate where we want guards and why.

Q. Okay. And do you believe that you would have delivered this memo in person to the beach house ***?

A. Yes."

It is not clear who he gave the copies of the memo to at the beach house.

¶ 9 Brittany Young-Hunter testified she was a certified lifeguard for the City in 2007 but had no experience in an open-water facility prior to working at the beach. She did not recall being given any manuals explaining procedures and policies at the beach. She did take a fitness and agility test at the beach. To pass the test, a lifeguard had to jump from the balcony of the beach house onto a pile of sand, run to the water, swim to the seawall, and then get back to the sand pile in three minutes or less. Young-Hunter testified a missing swimmer needed to be found within three minutes to avoid brain damage.

¶ 10 Young-Hunter did not remember doing any in-service training at the beach before she was allowed to work while the beach was open to the public. She testified she was a head lifeguard in 2007, had more responsibilities than a normal lifeguard, considered England to be her supervisor, and was never told she was to train the other lifeguards. In addition, she testified she was never given an EAP, never practiced a missing person EAP, and never did any "dummy drop" drills while working at the beach. A "dummy drop" drill requires lifeguards to locate a dummy the size of a child in the water, bring it to the surface, and then perform cardiopulmonary resuscitation (CPR). EAPs were discussed at both her StarGuard and Red Cross certification

training. According to Young-Hunter, EAPs are necessary because they help lifeguards respond faster in emergency situations. Based on her training with StarGuard and Red Cross, the EAPs should be written down so everyone knows what to do. Young-Hunter also testified EAPs need to be site specific.

¶ 11        When Eric drowned, two lifeguard chairs were in use. They were the "south mid chair," which was between the shoreline and the seawall on the south side of the swimming area, and the "slide chair," which was by the waterslide. Chase Gobble replaced Young-Hunter in the "slide chair" before the incident. Denis Caveny was in the "south mid chair." When Gobble announced for everyone to clear the water on his megaphone, Young-Hunter was not in the water. She ran toward Gobble to assess the situation. Gobble looked panicked. Someone said a patron was underwater or missing. Young-Hunter went into the water and noticed Caveny was no longer in the "south mid chair." She asked Gobble what happened but was given no information other than that they had a missing swimmer. While moving toward the deep end of the swimming area, she heard a woman, who she believed was a family member or friend of the missing person, say the missing person was by the seawall. Young-Hunter did not know whether the missing person could swim. She also did not know the swimmer's last known location, which was important information based on her training. Neither Denis Caveny nor any other lifeguard told her anything about Eric except he was missing. When she and Gobble got out to the area identified by the woman, she started diving looking for the missing person. After searching, she started blowing her whistle. When the other lifeguards who were working but were not on active duty at that moment started to respond, she noticed some of the guards had to go back to get rescue buoys. After the guards got in the water, the search for the missing swimmer was chaotic and unorganized. She tried to organize a line search, but everyone was so frantic she did not think her suggestion

registered with the other lifeguards.

¶ 12 According to Young-Hunter, during a line search, the lifeguards line up, hold hands, and walk together while dredging their feet back and forth until they cannot touch the bottom of the lake. Then, while staying in line, the lifeguards would start diving and feeling for the missing bather with their hands and feet. Because everyone is in a line, the lifeguards can make sure they cover the entire area. She said this is the best manner of finding a person in opaque water when you don't know where the person is. The line search starts in the area where the person was last seen. Eventually, a patron at the beach forced everyone to come together in the shallow end and start a line search. She testified 10 minutes passed between the time she heard Gobble clearing the water and when she blew her whistle. Once the line search started, they found Eric in less than a minute 10 to 15 feet from the "mid south chair," where Caveny had been sitting when the missing person was reported to him. Caveny had provided Young-Hunter with no information he learned from Eric's friend, who first reported Eric was underwater and could not swim. Cassie Gurnsey-Hopkins, who was also a head lifeguard, found Eric. Other lifeguards pulled Eric to the surface and carried him out of the water. She believed a nurse and possibly someone from the military took charge of Eric's treatment on the beach.

¶ 13 Also, according to Young-Hunter, when a person is reported missing to a lifeguard, the lifeguard should immediately blow his or her whistle, the water should then be cleared, and an EAP should be activated. She believed Eric would have been found in under three minutes if Caveny had immediately blown his whistle and a line search was formed when the other lifeguards responded.

¶ 14 Young-Hunter testified the lifesaving process was not set in stone. If she was in the lifeguard chair and was told someone just went underwater at a precise location, she might dive

in and save the person without clearing the water first. However, she indicated she would blow her whistle first. On the day at issue, she did not make a conscious decision not to blow her whistle before she started looking for Eric. The situation was confused from the beginning because no one took charge. With regard to information she was given by the woman on the beach, Young-Hunter assumed the woman knew Eric's last known location. However, she conceded the woman might have seen Caveny's head bobbing out by the seawall.

¶ 15    Kelly Pinkley testified she was a certified lifeguard at the beach but had no prior experience in an open-water facility. Pinkley also testified England had managerial authority over her. She did not recall seeing any memo he drafted for the beach staff. She indicated scanning was important for a lifeguard to help keep track of people in the water. If anyone was using the diving platform, a lifeguard needed to watch the person dive, surface, get back to, and climb on the platform. She testified lifeguards are required to follow EAPs to do their job properly. She believed an EAP was on the bulletin board at the beach house but did not remember what it said. According to Pinkley, if a lifeguard is told a person is missing, the lifeguard should first blow his or her whistle, then clear everyone out of the water, and then start looking for the missing person in his or her last known location. When other lifeguards arrived, they should do a line search for the person.

¶ 16    Pinkley was in the upstairs break room of the beach house when she heard a long whistle. She saw the water being cleared, jumped off the balcony, and started the EAP. She quickly put her guard suit top on and saw Casey Gurnsey putting her guard suit back on. Pinkley grabbed rescue tubes and headed to the water. The lifeguards she saw were in the deep water and scattered. She went to where the other lifeguards were and started searching underwater. She only knew they were looking for a boy. Pinkley thought she did five to seven surface dives searching

the bottom of the lake, with each search lasting between 30 seconds and a minute. The other lifeguards were doing the same. Eventually, the lifeguards formed a line search by the "south mid chair" and found Eric soon after starting just north of the chair.

¶ 17     Pinkley testified Caveny's and Gobble's placement at the beach was normal unless the beach was more crowded or if children at a summer camp were present. The lifeguard in the "south mid chair" was responsible for watching both the divers and people swimming in the deep water. Pinkley did not speak to Caveny about what happened.

¶ 18     Cassie Kovalski was a certified lifeguard and also had her open-water certification. She did not recall any other tests or training provided to her at the beach other than the fitness and agility test and treading water while holding a brick over her head. She also did not remember seeing England's memo prior to Eric drowning. If the diving board chair was not being used, the lifeguard in the "south mid chair" would watch the divers. According to Kovalski, a lifeguard should go into the water to assist someone he or she could see was struggling. However, when a lifeguard is informed someone is missing, the lifeguard should first blow his or her whistle, then clear the water, and then do a line search as soon as the other lifeguards arrived after responding to the whistle. She believed the lifeguards only blew their whistles if there was an emergency. She also indicated a staff member would look around the facilities in case the person was in the locker room or concession stand and not in the water.

¶ 19     When Eric was reported missing in the water, she saw people leaving the water. She went into the water to help the other guards who said they were looking for a non-swimmer. She did not remember hearing a whistle and started blowing hers because only four or five lifeguards were in the water. The other lifeguards in the water continued searching. She did four to six dives trying to find Eric. She was not told the missing swimmer's last known location and

estimated 10 minutes passed between her entering the water and the line search. After the line search started, Eric was found within five minutes far from where they were performing rescue dives. During her time working at the beach, she received no training on how to do a line search. She did not believe she was ever told where Eric was initially reported missing.

¶ 20 Denis Caveny testified he had lifeguard, CPR, and first aid certifications. He interviewed with England and believed England's authority exceeded everyone else's authority at the beach. If England told him to do something, he did it. The beach was Caveny's first open-water lifeguard job. He did not remember receiving any training at the beach or seeing or hearing about England's memo. As a certified lifeguard, he knew murky water was a known hazard and posed more of a safety risk than clear water. Caveny also acknowledged he knew non-swimmers went into areas marked as deep water.

¶ 21 Caveny testified EAPs are necessary for a lifeguard to do his or her job effectively. While he believed a lifeguard has some discretion to not follow an EAP, the EAP is not to be disregarded. He did not remember much about the EAP in place at the beach for a distressed patron in the water. After being shown his earlier deposition testimony, Caveny agreed the EAP for a drowning victim first required blowing your whistle and then clearing the water. The lifeguard would then try to locate the drowning victim by himself in the victim's last known location. If the lifeguard could not find the person, then a line search should be started right away. If no one knew where the missing person was, the lifeguards would clear the water and immediately start a line search. The EAP was initiated with three short whistle blasts to alert the other lifeguards of an emergency. After hearing the whistle, lifeguards would go to the water, clear the water if necessary, and then talk to other guards to determine how to help.

¶ 22 Just before Eric went missing, he and his group of friends were in front and a little

to the right of Caveny's chair. Before he was told Eric was missing, Caveny's attention was on a child using the diving board. Caveny said Eric's companion did not yell that Eric was missing. Instead, they got his attention and said their friend was missing and could not swim. Plaintiff's counsel pointed out Caveny told the police the person in Eric's group yelled this information to him. The person indicated Eric was last seen near where the person was standing, which was a little northwest of Caveny's chair. Caveny went to Eric's last known location within seconds and searched for him by doing a grid search underwater for 10 to 15 seconds. He could not see anything in the water but searched twice by himself. After the second search, Caveny yelled at Gobble to clear the water. Cavaney said he did not blow his whistle because he thought it would be more effective for Gobble to do it and for Caveny to keep searching. When Caveny told Gobble to clear the water, this was the first time another lifeguard was notified of the emergency. Caveny testified Eric was found about six to eight feet from the lifeguard chair where Caveny had been sitting, which was very close to where Eric's friends told Caveny they last saw him.

¶ 23   According to Caveny, after his second search underwater, Eric's friends said they saw bubbles out by the seawall and gestured toward the seawall. Caveny had no additional information. He then swam out by the seawall and started searching for Eric. Gobble soon joined Caveny. Caveny did not tell Gobble of Eric's last known location or that Eric could not swim. He did not remember who else came out that far to search or whether anyone in the water blew their whistle more than 10 times. Eventually, a line search was done, and Eric's body was quickly found. Caveny indicated a line search was the only effective way to find someone in water where you could not see. According to Caveny, when he was searching by the seawall, Eric's friends did not say he was looking in the wrong spot.

¶ 24   Darcy Woodrum and her husband Travis Woodrum both testified they were at the

beach on the day in question but were outside the fenced area when they noticed a commotion. They ran back to the water when they realized something serious was happening. Darcy called 911 because she believed someone was missing. She heard a boy arguing with a lifeguard, screaming someone had gone down in the water. The lifeguard told the boy to check the beach house for the missing person. Darcy told her husband to help the lifeguards because they were not doing much of a search. The boys who had been with Eric were saying Eric was last seen in the area where he was eventually found. Darcy said the lifeguards looked panicked, confused, and unorganized. She acknowledged neither she nor her husband had ever been a certified lifeguard or knew what rules and procedures lifeguards are expected to follow.

¶ 25    Travis Woodrum testified no one knew what was going on at the beach, and he had not heard a whistle. After about five minutes, he noticed lifeguards running back and forth from the water to the beach house to get floatation devices and other equipment. He then heard a lifeguard tell another lifeguard to blow his or her whistle. After the whistle was blown, more lifeguards came to the water. Like his wife, Travis testified a group of boys who had been with Eric were telling a lifeguard Eric was at the location where he was finally found. Because the lifeguards did not seem to be doing anything, Travis and another man went into the water. Eventually some civilians and lifeguards started doing a line search and found Eric. Travis testified he pulled Eric out of the water and carried him to shore.

¶ 26    Gerry Dworkin testified as an expert in lifeguarding and aquatic safety. After reviewing deposition transcripts of all the lifeguards present, the City's discovery responses, photographs, and police reports, and considering materials he had on lifeguarding and aquatic safety available around 2007, he testified it was his opinion to a reasonable degree of certainty with regard to lifeguarding and aquatic safety that the City failed to establish its own operational

protocols and surveillance protocols and did nothing to train its lifeguards through pre-service and in-service training necessary to ensure the lifeguards could operate as a team both in preventing and managing accidents. He testified the evidence was clear the lifeguards did not respond appropriately to the incident. Dworkin testified the City through its agents at the beach showed a conscious disregard for the supervision and management of its lifeguards, which was a proximate cause of Eric's drowning death because the lifeguards failed to (1) recognize Eric's distress because of a lack of established surveillance protocols, (2) appropriately respond to a report of a missing bather, and (3) appropriately search for the missing bather.

¶ 27    Dworkin testified drowning was a known hazard and danger in the lifeguarding industry in 2007. According to Dworkin, certified lifeguards are not qualified to work at every aquatic facility. He noted organizations that provide certification advocate for certified lifeguards to receive site-specific pre-service training and regular in-service training. Dworkin also testified every aquatic facility should have a comprehensive risk management program, which includes conducting a comprehensive threat assessment to develop operational protocols and procedures to prevent, recognize, and manage incidents and a plan to train its employees for potential incidents. Dworkin testified the City, the managers, and the lifeguard supervisors did nothing to provide site-specific training for the lifeguards and did not know anything about the protocols the lifeguards were following. According to Dworkin, lifeguards need to be supervised, and it is critical for the facility manager to develop standard operating procedures, including EAPs, to ensure a consistent response to emergencies. Dworkin indicated lifeguards cannot simply be hired at the beginning of the summer and told to do their jobs without any site-specific training.

¶ 28    While the City had somewhat of a plan for locating a missing person, Dworkin said the City's plan failed to distinguish between a missing person outside the water and a missing

bather. As a result, Dworkin thought the City's plan was not good. He also indicated none of the lifeguards testified they had practiced an in-service missing bather EAP. While the lifeguards knew what should have been done, Dworkin testified they failed to follow the appropriate steps during the emergency because no protocols were in place and they were not properly drilled to prepare for the situation.

¶ 29        Dworkin testified any missing bather report in an open-water facility is a true emergency. If a lifeguard gets such a report from a credible witness, it is critical to put the witness in the position where they last saw the victim and the search needs to be done in that location in an organized and coordinated manner. Dworkin also testified it has been well known for decades that non-swimmers will go into deep water. Dworkin believed Eric's drowning was preventable.

¶ 30        Michael Jones, Eric's brother, testified he, Eric, and their cousins went to the beach to have a good time. Eric wanted to learn to swim. It was Michael and Eric's first time at the beach. They went into water about chest deep. At some point, Michael slipped, and he grabbed Eric, who was by him. Their cousin then grabbed Michael and swam him to shallower water. When this happened, Michael lost contact with Eric. Michael looked for Eric but could not see him. He called to a lifeguard and told him his brother was under the water and could not swim. The lifeguard got in the water, and Michael told him where he had lost contact with Eric, which was close to where Michael was standing. The lifeguard started looking for Eric, but not in the area Michael told him to look. Michael was hollering at the lifeguard and pointing to where Eric had been. However, the lifeguard did not hear him, and Michael was told he had to get out of the water. A lifeguard then asked Michael to check the locker room to see if Eric was in there, which Michael did. When he came back from the locker room, the lifeguards were not in the area where he told them Eric was last seen.

¶ 31         After plaintiff rested, the City moved for a directed verdict based on our supreme court's decision in *Barr v. Cunningham*, 2017 IL 120751, ¶ 18, 89 N.E.3d 315, arguing plaintiff did not present sufficient evidence to establish the City's actions were willful and wanton. The trial court denied the City's motion.

¶ 32         The City then presented its witnesses. Cassandra Gurnsey-Hopkins testified she was one of the head lifeguards during the summer of 2007. The City only hired certified lifeguards to work as lifeguards at the beach. In 2004, when she started working at the beach, in-service training was provided once a summer, sometimes more. She believed the EAP in 2007 for a missing swimmer whose location was identified in the water by his companions required immediate action to try and find the missing swimmer by checking the indicated area first. She noted lifeguards are reliant on information provided by the missing person's companions.

¶ 33         Gurnsey-Hopkins was in the break room when she became aware of the situation. She believed Gobble was blowing his whistle. She jumped from the balcony, grabbed a lifeguard tube, and ran to the water as the patrons were leaving it. She was told what was happening by other lifeguards, and she spoke to some people who said they were Eric's friends. She testified Eric's friends said he went underwater and was last seen by the seawall. She then started searching by the seawall with the other lifeguards in a coordinated dive search. When they did not find anything, she and Young-Hunter decided to start a line search at the shoreline. She said the line search was organized by the lifeguards, not a patron. Eventually, they got to a place in the water where they could not touch so they started diving. Her foot went into Eric's back. She came back up, told Gobble she found Eric, and Gobble grabbed Eric and took him to the shore.

¶ 34         On cross-examination, Gurnsey-Hopkins testified a missing person EAP was never practiced. She indicated she would have first blown her whistle to notify every other lifeguard of

- 14 -

an emergency if she was in Caveny's situation. She stated the act of blowing the whistle started the EAP. She was conscious of this and believed the other lifeguards were as well. Another guard would use a megaphone to clear the water of people and point to where the initial whistle was blown so the responding lifeguards would know where the emergency was. She testified the next step would be to start a bottom search where the victim was last known to be.

¶ 35 Gurnsey-Hopkins acknowledged non-swimmers were always trying to go into deeper water instead of staying in the shallow area. She also stated all the lifeguards should have had a clear understanding of the action plans. On cross-examination, she acknowledged she did not talk to anyone who was with the victim before she went into the water by the seawall and started searching. The only person she spoke to before starting to search the water was another lifeguard. She acknowledged she said the search was disorganized during a deposition in 2009.

¶ 36 Tyler Lobemaster testified he started working at the beach in June 1999 and was a beach house manager in 2007. He had never been a lifeguard and was not at the beach on the day in question. He testified they had EAPs at the beach, which were kept either in the manager's office or in the lifeguard station. The EAPs were discussed among the lifeguards and with management at the beginning of the season and also occasionally during the three-month season. He was not involved in any drills or lifeguard safety exercises. The head lifeguard would set up those practices, and he did not tell the lifeguards what drills to do. He said the training included mock emergency drills and also the fitness and agility test previously discussed. The City provided the lifeguards with whistles, floating devices, body boards, backboards, CPR masks, and other equipment. He knew of no situation where a lifeguard was indifferent to the safety of a patron or disregarded their obligations to the patrons.

¶ 37 Lobemaster said Douglas England was his supervisor. England would get

equipment for the beach when it was needed and have repairs done at the beach. In his opinion, every lifeguard was conscious the EAPs were essential to save the lives of distressed swimmers. He believed every lifeguard should have been conscious and knowledgeable of the emergency actions plans and knew the plans had to be followed to the letter because lives depended on it.

¶ 38 Kate Blankenship, formerly Kate Figueira, testified she was a beach manager in 2007. She started working at the beach as a certified lifeguard and worked as a lifeguard for five or six summers. The last summer she worked at the beach in 2007, she was promoted to manager. She was not a certified lifeguard at the time of the incident in this case. The beach required all its lifeguards to be certified. She testified they did in-service training, which might include fishing something heavy off the bottom of the diving well or engaging in role-playing scenarios. She said they did this at least once or twice per year.

¶ 39 When asked what a lifeguard is supposed to do if a patron says his friend went underwater and provides the last known location for the missing person, Blankenship responded the lifeguard is supposed to use their whistle to notify the other lifeguards of the potential emergency. This keeps the lifeguard from trying to deal with the situation by himself or herself. When asked if a line sweep is feasible in deeper water, Blankenship said it can be done. When lifeguards are performing the line sweep and running out of ground to walk on, they stay in a line and submerge themselves, feel around, come back up, and then move forward in a line as best as possible. She testified she believed it was acceptable for the lifeguard to immediately search the area where the person was last seen before blowing his whistle.

¶ 40 On the day in question, she heard a whistle being blown. She was on the second floor of the beach house, jumped over the rail onto the sand pile, and then went down to see what was happening. She believed she was told someone was missing. Eric had been with family

members, and they were not sure if he was in the water or elsewhere. She believed the people originally said Eric was out by the seawall. She checked around places where Eric might be. When he was not found, she went back to the water and joined in the line search. She said no patron had taken over the situation and was telling the lifeguards what to do. After the line search started, she believed Eric was found within three to four minutes. She testified Caveny never told her Eric was found where he was reported missing.

¶ 41    Carl Brunsman testified he worked as a lifeguard at the beach. In a situation where a swimmer was missing, the lifeguard was supposed to blow his whistle to alert other lifeguards of the situation. If a lifeguard is told a person went under in a specific location, the lifeguard should immediately start looking in that area instead of waiting for a line search. He did not remember if he heard a whistle on the day in question. When he got to the beach, it was cleared. He heard the lifeguards say they thought the victim might have been in a different spot. The lifeguards then regrouped and started the line search. After Eric was found, Brunsman swam him back to shore. A random person at the beach tried to come over and start doing CPR on Eric while he was still in the water. Gobble hollered at the person that you cannot do CPR while the person is still in the water. When asked whether he made any conscious decision to disregard rules or procedures, Brunsman said he did not believe so. He explained instinct and training kick in during a situation like that. Brunsman said that is why you train.

¶ 42    Brunsman testified the beach was the first open-water facility he worked at. Besides the fitness and agility test, Brunsman testified he did not receive any in-service training at the beach. He was not told the missing person was a non-swimmer. He was also not told the last known point the missing person was seen was directly in front of the "south mid chair."

¶ 43    Chase Gobble, a head lifeguard at the beach at the time of Eric's death, testified he

- 17 -

was a certified lifeguard but did not have an open-water certification. According to Gobble, some in-service training was done at the beach, but only when the managers said it needed to be done. In the training sessions they did have, they never practiced line searches. Gobble did not receive any kind of manual from the beach and had no memory of seeing one. He agreed the water at the lake was much more dangerous for swimmers than water at a pool because of the water's opaqueness. Gobble indicated England was in a position of authority over the beach managers and lifeguards. If England asked Gobble to do something, Gobble would have done it. Gobble never received the memo England said he took to the beach weeks before Eric drowned.

¶ 44        According to Gobble, when Eric went underwater, Gobble was in a lifeguard chair in the shallow part of the lake and Caveny was in a lifeguard chair in deeper water. Gobble indicated this was a common set-up for the guards if the beach was not busy. He first became aware something was wrong when Caveny told him to clear the water. Gobble used his megaphone to do so. He testified someone blew his whistle, but he was unsure who did so. Gobble went into the water to help Caveny. Gobble said the kids who were talking to Caveny said Eric was out by the wall. Gobble and Caveny then went out by the seawall and looked for Eric. They were out searching by the wall for a few minutes. When they did not find him, they started a line sweep and found him within a minute or two.

¶ 45        According to Gobble, when a lifeguard is told a person is missing, the lifeguard is supposed to blow his whistle three times. This is what Caveny should have done. Because the lifeguard who received the report would have the most information regarding the last location of the missing person, another lifeguard would clear the water of patrons. Gobble did not remember if he stayed in his chair until everyone had left the water. Gobble said the next step in the EAP was to start a line search. According to Gobble, Caveny never told him the people with Eric said

he could not swim and was last seen within feet of the lifeguard chair Caveny had been using. Had Caveny told him this, Gobble would not have gone to the seawall to look for Eric. Instead, Gobble would have started a line search right away.

¶ 46        David Stewart Smith testified as an expert witness in the field of aquatic safety for the City. He indicated he reviewed the deposition or trial testimony of two of Eric's cousins, Eric's brother, 10 lifeguards who were present and working on the day of the incident, Eric's mother, Lobemaster, England, and a few other people. He also reviewed police reports and lifeguarding manuals from the Red Cross, the YMCA, and the United States Lifesaving Association. Smith testified neither the individuals managing the beach nor the lifeguards showed an utter disregard or conscious indifference for the safety of its patrons. Smith believed "utter indifference" meant no one cared about saving Eric, which was not true. He believed plaintiff needed to introduce some evidence the lifeguards did not care what happened to Eric to prevail.

¶ 47        Smith noted the City required certified lifeguards, provided proper equipment, and followed Illinois law with regard to lifeguard staffing requirements. The City also posted warnings for novice swimmers. As for in-service training, Smith noted five lifeguards testified they remembered receiving some training at the beach. Smith testified Caveny's initial search at the location where a witness said he last saw Eric did not represent an utter disregard, utter indifference, or complete disregard of Eric's situation. Smith opined Eric's conduct alone was the proximate cause of his death.

¶ 48        Smith acknowledged he had previously written that rescuers must be so practiced in certain aspects of protecting themselves, their clients, or their prospective victims to allow them to have an appropriate instinctive response. Smith agreed this was best accomplished by the rescuers participating in specific drills in the water on an individual and group basis.

¶ 49     We note all of the lifeguards who were asked indicated they took their job seriously, would have done everything in his or her power to rescue a drowning person, and did not consciously disregard his or her duties for the safety of the beach patrons.

¶ 50     At the close of all the evidence, the City made an oral motion for a directed verdict, referencing its earlier motion for a directed verdict and adding an argument the evidence established the City's conduct fell within the City's discretionary immunity per statute. The trial court denied the City's motion.

¶ 51     The jury returned a verdict in favor of plaintiff and found the total amount of damages to be $1,500,000 ($750,000 for past and future grief and sorrow and $750,000 for post and future loss of society). The jury also found the percentage of negligence attributable solely to Eric Jones was 50%. As a result, plaintiff was awarded $750,000 in recoverable damages.

¶ 52     On June 10, 2021, the City filed a posttrial motion for judgment notwithstanding the verdict. On January 5, 2022, the trial court denied the City's motion, stating:

> "The present case involves a known dangerous activity and there was sufficient evidence to support the jury's verdict finding willful and wanton conduct by the [the City] and/or [its] agents. The Court further finds 745 ILCS 10/2-201 Discretionary Immunity does not apply as section 745 ILCS 10/3-108 is controlling."

This appeal followed.

¶ 53                                II. ANALYSIS

¶ 54     On appeal, the City argues the trial court erred by not granting its motion for judgment notwithstanding the verdict because the evidence presented did not establish the actions of the City and its agents rose to the level of willful and wanton conduct. Therefore, the City

argues it was immune from liability pursuant to section 3-108 of the Act (745 ILCS 10/3-108 (West 2006)). The City also claims it is entitled to discretionary immunity pursuant to sections 2-201 and 2-109 of the Act (745 ILCS 10/2-201, 2-109 (West 2006)) for decisions its employees made while operating the beach.

¶ 55    In *Harris v. Thompson*, 2012 IL 112525, ¶ 15, 976 N.E.2d 999, our supreme court provided the following guidance with regard to reviewing the denial of a motion for judgment notwithstanding the verdict, which is often referred to as a judgment *n.o.v.*:

> " '[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand.' *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). Where the uncontradicted evidence, viewed in the light most favorable to the plaintiff, establishes a complete defense, a court is justified in granting the defendant's motion for a judgment *n.o.v.* [Citations.] An adverse ruling on a motion for a directed verdict or a judgment *n.o.v.* is reviewed *de novo*. [Citation.] In other words, the reviewing court applies the same *Pedrick* standard as did the circuit court."

The question here is whether the evidence in this case establishes the City is entitled to immunity under the Act.

¶ 56                                A. Willful and Wanton Conduct

¶ 57    The City first argues the evidence in this case clearly establishes neither it nor its employees engaged in willful and wanton conduct. As a result, the City argues it is entitled to immunity pursuant to section 3-108(a) of the Act (745 ILCS 10/3-108(a) (West 2006)), which

states, "[e]xcept as otherwise provided in this Act, neither a local public entity nor a public employee who undertakes to supervise an activity on or the use of any public property is liable for an injury unless the local public entity or public employee is guilty of willful and wanton conduct in its supervision proximately causing such injury."

¶ 58    Section 1-210 of the Act (745 ILCS 10/1-210 (West 2006)) defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." In *Harris*, 2012 IL 112525, ¶ 41, 976 N.E.2d 999, our supreme court provided the following guidance:

> "The term 'willful and wanton' includes a range of mental states, from actual or deliberate intent to cause harm, to conscious disregard for the safety of others or their property, to utter indifference for the safety or property of others. [*Murray*, 224 Ill. 2d 213, 235, 864 N.E.2d at 189.] Further, this definition of willful and wanton conduct is entirely consistent with this court's long-standing case law. [Citations.] Whether conduct is willful and wanton depends on the circumstances of each case."

Ordinarily, the determination whether conduct is willful and wanton is a question of fact for the jury. *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 245, 864 N.E.2d 176, 194 (2007). However, if the evidence is so overwhelmingly in favor of one party that a different result cannot stand, a court may decide as a matter of law whether the conduct is willful and wanton. *Bielema ex rel. Bielema v. River Bend Community School District No. 2*, 2013 IL App (3d) 120808, ¶ 12, 990 N.E.2d 1287.

¶ 59    According to the City's brief, the supreme court in *Barr* clearly held that when a

unit of local government takes steps to prevent injuries, the fact the entity did not take additional steps that would have prevented an injury does not establish the entity exhibited a conscious disregard for the safety of others. The City then argues the supreme court's reasoning in *Barr* is representative of the uniform law followed in Illinois. As examples of this uniformity, the City cites and provides a brief summary of the following cases: *Bielema,* 2013 IL App (3d) 120808; *Geimer v. Chicago Park District*, 272 Ill. App. 3d 629, 650 N.E.2d 585 (1995); *Tagliere v. Western Springs Park District*, 408 Ill. App. 3d 235, 944 N.E.2d 884 (2011); *Stiff by Stiff v. Eastern Illinois Area of Special Education*, 279 Ill. App. 3d 1076, 666 N.E.2d 343 (1996); and *Biancorosso v. Troy Community Consolidated School District No. 30C*, 2019 IL App (3d) 180613, 151 N.E.3d 662.

¶ 60       The City seems to suggest these cases stand for the proposition an entity covered by the Act that takes some steps to protect an individual or individuals cannot be found to have engaged in willful and wanton conduct. We disagree. See *In re Estate of Stewart*, 2016 IL App (2d) 151117, ¶ 105, 60 N.E.3d 896 ("We disagree with the District's implication that taking *any* action in response to a known danger is sufficient to insulate a defendant from allegations of willful and wanton conduct."). While the fact more safety precautions could have been taken by a defendant does not establish the defendant's conduct was willful and wanton, this does not mean the conduct of a defendant who took some safety steps cannot be willful and wanton. "Whether conduct is willful and wanton depends on the circumstances of each case." *Harris*, 2012 IL 112525, ¶ 41, 976 N.E.2d at 1011.

¶ 61       The jury in this case had sufficient evidence to find the City and its employees showed a conscious disregard for the safety of its patrons at the beach, including Eric, by failing (1) to have a clearly established EAP dictating how the lifeguards should handle a situation where a swimmer was missing in the water and (2) to require the lifeguards to practice responding to a

situation where a person is reported missing in the opaque water at the beach.

¶ 62     The evidence showed this was Denis Caveny's first lifeguard job at an open-water facility. He received no in-service training at the beach. The evidence showed he was the first lifeguard notified Eric was missing. Instead of blowing his whistle to alert the other lifeguards of the potential emergency as he should have done, he entered the water and started searching for Eric. Only after doing two searches by himself did he alert another lifeguard, Chase Gobble, to clear the water. While Gobble used his megaphone to clear the water, some evidence showed he also failed to blow his whistle to alert the other lifeguards. Caveny then failed to tell Gobble or any other lifeguard the missing swimmer could not swim and was last seen near the lifeguard tower where Caveny had been sitting. According to Gobble, if he knew this information, he would have started a line search right away. Instead, Gobble followed Caveny out by the seawall and searched for Eric there. When the whistle was finally blown, the other lifeguards responded to the area where Caveny and Gobble were searching. The lifeguards wasted valuable time looking for Eric in the wrong location. Witnesses testified the search by the seawall was disorganized, with no one in charge.

¶ 63     Plaintiff's expert, Gerry Dworkin, testified the City and its agents did nothing to train its lifeguards through pre-service or in-service training, which was necessary to ensure the lifeguards could operate as a team both in preventing and managing accidents. Dworkin testified the lifeguards failed to respond appropriately when this emergency occurred. The evidence was clear that drowning is a known danger at an aquatic facility. In this case, the evidence showed the lake water was even more dangerous, especially when a bather is missing, because the lifeguards could not see in it. Based on the totality of the circumstances in this case, the fact the City and its agents failed to have a clear EAP in place for what the lifeguards should do if a bather was missing

in the water combined with the fact the City and its agents did not require the lifeguards to practice and drill what they should do in this type of situation in the opaque beach water was strong evidence of the City's conscious disregard of the safety of its patrons, including Eric.

¶ 64    Dworkin testified the lifeguards knew what should have been done but failed to take the proper actions when the emergency actually occurred because the City and its agents had failed to train them for the situation. Even the City's expert agreed rescuers should practice responding to emergencies so they would have an appropriate instinctive response to an emergency situation. Plaintiff also introduced evidence neither England nor the beach managers told the lifeguards they were in charge of training themselves.

¶ 65    Based on the record in this case, the trier of fact had sufficient evidence to find the failure of the City and its agents to have a clear EAP for this situation and to practice what needed to be done if a swimmer went missing in the beach's opaque water, a known dangerous situation, constituted willful and wanton conduct that led to Eric's death. Because the record contained sufficient evidence for a trier of fact to determine the City and its agents engaged in willful and wanton conduct, the City was not entitled to immunity pursuant to section 3-108 of the Act (745 ILCS 10/3-108 (West 2006)), and the trial court did not err in denying the City's motion for judgment notwithstanding the verdict.

¶ 66                    B. Statutory Discretionary Immunity

¶ 67    The City also claims the trial court erred in not granting its motion for judgment notwithstanding the verdict because it is entitled to statutory discretionary immunity as a matter of law pursuant to sections 2-201 and 2-109 of the Act (745 ILCS 10/2-201, 2-109 (West 2006)). Section 2-109 states "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2006).

Section 2-201 states, "[e]xcept as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2006).

¶ 68    In the trial court, plaintiff argued section 2-201 does not apply because section 3-108 covers the specific situation in this case. The trial court agreed. Although the trial court did not specify the authority on which it relied, plaintiff's response to the City's motion for judgment notwithstanding the verdict cited *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 864 N.E.2d 176 (2007). In *Murray*, our supreme court stated:

"Even when an immunity provision does not contain conditional language as found in sections 2-201 and 3-108(a), this court has not hesitated to consider whether the immunity afforded by one provision might be negated or otherwise limited by some other applicable provision. [Citations.] It is a well-settled rule of statutory construction that [w]here there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one subject, the particular provision must prevail." (Internal quotation marks omitted.) *Murray*, 224 Ill. 2d at 233, 864 N.E.2d at 188.

¶ 69    In its appellant's brief, the City failed to address the trial court's conclusion section 2-201 did not apply in this case because section 3-108 is controlling. In fact, appellant's brief did not even mention section 3-108 or *Murray* when discussing why the trial court erred in not applying section 2-201. As a result, pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018), we find the City forfeited any argument the trial court erred in holding section 3-108 of the Act is controlling in this case. "A reviewing court is entitled to have the issues clearly defined

with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument and research." *People v. Hood*, 210 Ill. App. 3d 743, 746, 569 N.E.2d 228, 230 (2001).  We will address this issue no further.

¶ 70                                    III. CONCLUSION

¶ 71            For the foregoing reasons, we affirm the trial court's judgment.

¶ 72            Affirmed.